UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTIANN SOTO,

                              Plaintiff,

                -v.-

CDL (NEW YORK) L.L.C.,

                              Defendant.

18 Civ. 5678 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

    In June 2016, Plaintiff Christiann Soto began work as a housekeeping manager at Defendant CDL (New York) L.L.C.'s Millennium Broadway Hotel in New York City, with the hope that she would be able to gain valuable experience managing union employees.  Instead, according to Plaintiff, she entered a workplace where employees openly discussed sex and viewed pornographic videos, and where she would be the target of three separate non-consensual physical incidents over the course of five months.  Plaintiff was so traumatized by her experiences as Defendant's employee, and so disappointed in Defendant's response to her complaints, that she resigned in February 2017.

    Plaintiff brought suit against Defendant, alleging the creation of a hostile work environment, retaliation, and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, *codified as amended at* 42 U.S.C. §§ 2000e to 2000e-17; the New York State Human Rights Law, N.Y. Exec. Law §§ 290-97 (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 to 8-131 (the "NYCHRL").  Defendant now moves for summary judgment on all claims, arguing that Plaintiff's hostile work

environment and constructive discharge claims fail as a matter of law because

Plaintiff took immediate and effective action in response to Plaintiff's

harassment complaints.  Defendant contends that Plaintiff's retaliation claims

fail as well because she has failed to show that Defendant took any adverse

employment actions against her in response to her complaints.  For the

reasons set forth in the remainder of this Opinion, Defendant's motion is

granted in part and denied in part.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff is a woman currently residing in the Bronx, New York.  (Def.

Reply 56.1 ¶ 1).  Defendant is a corporation that owns Millennium Broadway

---

[1]    The facts set forth in this Opinion are drawn from Plaintiff's Complaint (the "Complaint" or "Compl." (Dkt. #1)); Defendant's Response to Plaintiff's Rule 56.1 Statement of Additional Material Facts ("Def. Reply 56.1" (Dkt. #59)); the exhibits attached to the Declaration of Cynthia A. Augello in Support of Defendant's Motion for Summary Judgment ("Augello Decl., Ex. [ ]" (Dkt. #53)); the exhibits attached to the Declaration of Silvia C. Stanciu in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Stanciu Decl., Ex. [ ]" (Dkt. #56)); and the exhibits attached to the Declaration of Cynthia A. Augello in Further Support of Defendant's Motion for Summary Judgment ("Augello Reply Decl., Ex. [ ]" (Dkt. #58)).

The Court also relies on Plaintiff's Affidavit in Opposition to Defendant's Motion for Summary Judgment ("Pl. Aff." (Dkt. #55)), and the Affidavit of Casey Ravines in Support of Defendant's Motion for Summary Judgment ("Ravines Aff." (Dkt. #52)).  Defendant challenges the Court's ability to rely on Plaintiff's Affidavit, claiming that the affidavit either reiterates conclusory allegations or contradicts her deposition testimony.  (Def. Reply 3).  However, the Court's review of Plaintiff's Affidavit shows that the Affidavit, at most, "amplifies or explains" Plaintiff's prior testimony and does not contradict it.  *See Bright* v. *Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6, 8 (2d Cir. 2015) (summary order).  Plaintiff, in turn, challenges the Court's ability to rely on the Ravines Affidavit, claiming that it is "neither executed nor notarized."  (Pl. Opp. 1).  This assertion is facially incorrect — the Affidavit is both.  (*See generally* Ravines Aff.).  Accordingly, the Court considers both affidavits.

2

Hotel (the "Hotel"), a hotel located in Manhattan, New York and the situs of all relevant occurrences in this action.  (*Id.* at ¶ 2).  In aid of hotel operations, Defendant has implemented a number of policies and procedures, several of which are relevant to the issues in dispute.

*First*, Defendant maintains an Employee Handbook that was most recently updated in 2014.  (*Id.* at ¶ 57).  Employees are given the handbook during their new-hire orientation and are informed that they need to read it. (Stanciu Decl., Ex. 21 ("Rodriguez Dep.") at 24:7-10).  One chapter of the handbook is entitled "Policy Against Harassment," and it outlines various behaviors that may constitute harassment.  (Augello Decl., Ex. B).[2]  The policy

---

For ease of reference, Defendant's opening brief is referred to as "Def. Br." (Dkt. #51); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #54); and Defendant' reply brief as "Def. Reply." (Dkt. #57).

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Finally, the Court notes its dismay with Defendant's decision to flout the Court's Individual Rules of Practice in Civil Cases, the relevant provision of which was implemented years before Defendant's motion was filed.  *See* Rule 5(c)(iv) ("Each memoranda of law must include a statement of facts, and may not simply incorporate by reference the entirety of a party's 56.1 Statement.").  Future efforts by Defendant's counsel to circumvent the Court's page limitations will be countered with outright rejection of the briefing.

[2]   It is unclear whether the Policy Against Harassment outlined here is identical to the policy in the handbook Plaintiff received when she commenced her employment. Although it is certain that Plaintiff received a handbook that was most recently revised in October 2014 (*see* Augello Reply Decl., Ex. A), the handbook produced to the Court seems to have been revised in January 2004 (*see* Augello Decl., Ex. B).

further mandates that employees who are the subject of harassment "must immediately report the incident" to their supervisor. (*Id.*). If reporting to a supervisor is not possible or would be otherwise inappropriate, employees are directed to immediately contact the Director of Human Resources, the Vice President of Human Resources, or the Legal Department. (*Id.*). The policy also places an affirmative duty on supervisors who receive reports of possible harassment to inform Human Resources and other relevant entities promptly. (*Id.*). Finally, the policy expressly prohibits retaliation against any individual who makes a complaint of harassment. (*Id.*).

At the back of the handbook is an Employee Acknowledgement form, on which employees are directed to acknowledge that they have reviewed and understood, *inter alia*, the Policy Against Harassment. (Augello Decl., Ex. B). Employees are further directed to return a signed copy of the Acknowledgement form to either their supervisor or the Director of Human Resources. (*Id.*). Plaintiff signed this form on June 20, 2016. (Augello Reply Decl., Ex. A). Beyond the Employee Acknowledgement form, however, Defendant had no mechanism for ensuring that employees reviewed and understood the policies contained in the handbook. (Rodriguez Dep. 25:20-25).

*Second*, all new hires at the Hotel are required to participate in an online, interactive harassment training. (Rodriguez Dep. 26:7-27:11). Notice of completion of the training is then sent to Defendant's corporate offices, though Human Resources ("HR") is not specifically tasked with verifying that it has a certification of completion from every employee. (*Id.* at 27:14-25).

4

*Third*, and finally, Defendant employed both union and non-union personnel. (*Cf.* Def. Reply 56.1 ¶ 65). Relevantly for this action, Defendant did not have the ability unilaterally to change the schedule of a union employee. (*Id.* at ¶ 73). Instead, a union employee's schedule could only be changed upon the request of the employee or after a consultation with a designated union representative. (*Id.*).

### 2.    Plaintiff's First Few Months at Defendant's Hotel

Plaintiff began her employment at the Hotel in June 2016, in the position of Housekeeping Manager. (Def. Reply 56.1 ¶ 3). On her first day of employment, Plaintiff received a copy of Defendant's Employee Handbook. (*Id.* at ¶ 4). As already mentioned, Plaintiff signed a form acknowledging that she had reviewed the handbook, including the Policy Against Harassment, and understood its contents. (Augello Reply Decl., Ex. A).

On Plaintiff's first day of work, one of her colleagues asked whether she would be returning to work the following day. (Def. Reply 56.1 ¶ 88). Plaintiff learned that her predecessor was a woman who had resigned after her first day on the job, and Plaintiff thus perceived her colleague's remark as being one directed at her sex. (*Id.*). Soto quickly came to learn that her co-workers would openly discuss sex, and their personal sexual experiences, in the workplace. (*Id.* at ¶ 89). Plaintiff alleged in her Complaint that these kinds of conversations occurred on a daily basis (Compl. ¶ 9), but during her deposition she was only able to recall two specific examples (Stanciu Decl., Ex. 20 ("Pl. Dep.") at 50:22-52:18). As the first example, Plaintiff recorded in early October

5

2016 a conversation between Jessica Santiago and Jolene Frazier — two housekeeping coordinators — and an unidentified houseman, in the course of which the three co-workers were viewing pornographic videos on their phones. (Def. Reply 56.1 ¶ 91).  Plaintiff repeatedly asked Santiago, Frazier, and the houseman to end the conversation and put away their phones, but the three ignored Plaintiff's pleas.  (*Id.* at ¶¶ 93-94).

As the other example of inappropriate workplace conversation, Plaintiff recalled overhearing Nicholas Santana — the Assistant Director of Housekeeping and one of Plaintiff's supervisors — repeatedly refer to a female, African-American manager as a "BBD," which is an acronym for "Big Black Dick."  (Def. Reply 56.1 ¶ 90).  Apart from these two specific examples, Plaintiff was unable to point out any other instances of inappropriate conversation in the workplace.  (Pl. Dep. 52:9-18).  Plaintiff also never reported any of these conversations to anyone, claiming that she was scared to make a complaint due to how commonplace the behavior seemed to be.  (*Id.* at 57:8-17).  The parties dispute whether Plaintiff ever participated in or initiated any of these inappropriate workplace conversations.  (Def. Reply 56.1 ¶ 95).

### 3. The First Incident of Harassment

Plaintiff alleges that on October 22, 2016, at approximately 8:45 a.m., she was leaving the women's bathroom on the Hotel's ninth floor when she encountered Juan Perdomo, Francisco Blanco, and Milton Plummer.  (Def. Reply 56.1 ¶ 96).  Perdomo allegedly reached over and grabbed the right side of Plaintiff's stomach.  (*Id.*).  Plaintiff told Perdomo not to touch her like that ever

again, to which Perdomo laughed.  (*Id.* at ¶ 97).  Plaintiff immediately reported the incident to Rhonda Rondon, one of her supervisors.  (*Id.* at ¶ 98).  Plaintiff, in a state of emotional agitation, told Rondon that she felt extremely violated by Perdomo's actions.  (*Id.*).  Rondon assured Plaintiff that she would report the incident to Santana and Vanessa Williams, another supervisor.  (*Id.* at ¶ 99).  After making her complaint to Rondon, Plaintiff went to the bathroom and cried.  (*Id.* at ¶ 100).  Upon returning from the bathroom, Plaintiff told Rondon that she did not want to work in the same section as Perdomo anymore.  (*Id.* at ¶ 101).  Later that evening, Plaintiff sent her own email to Williams and Santana informing them of the incident with Perdomo and expressing her discomfort with the situation.  (*Id.* at ¶ 102).

### 4.    Defendant's Employees Investigate Plaintiff's Claim

The record indicates that Soto's supervisors did not sit on her complaints.  At 12:01 p.m. on October 22, 2016, Rondon emailed Williams and Santana and informed them of the incident with Perdomo.  (Stanciu Decl., Ex. 1).  Williams, in turn, forwarded Rondon's email on to Casey Ravines, the Director of Human Resources at all relevant times.  (*Id.*; Def. Reply 56.1 ¶ 5).  After receiving Plaintiff's email in the evening of October 22, 2016, Williams similarly forwarded Plaintiff's email to Ravines, letting him know that the incident had clearly affected Plaintiff and needed to be addressed with Perdomo.  (Augello Reply Decl., Ex. B at 21).  Santana, for his part, forwarded Plaintiff's email to Ravines; Erica Rodriguez, a human resources manager; Sanjay Mahajan; Joseph Turano, the General Manager; and Scott White,

Director of Labor and Employee Relations.  (*Id.* at 17).  White directed Santana to interview Perdomo, Blanco, and Plummer immediately, and told Santana that, if he believed there was cause, to send Perdomo home.  (*Id.* at 19).  White emphasized, "We need to make sure she feels protected."  (*Id.*).  Santana confirmed that he would conduct the inquiry the next day and update everyone afterwards.  (*Id.* at 22).

On October 23, 2016, at 11:45 a.m., Santana emailed Rodriguez, Ravines, Turano, Mahajan, and White, informing them that he had spoken with Blanco, Perdomo, and Plummer.  (Augello Reply Decl., Ex. B at 24).  Although the three men acknowledged seeing Plaintiff on the morning of October 22 and wishing her good morning, all three denied that Perdomo touched her, or that the three had any interaction with her other than wishing her good morning. (*Id.*).  Ravines responded to Santana's report by email ten minutes later, thanking him for his due diligence and informing everyone that he would speak on Monday with Anthony D'Alessio, Director of Safety and Security, to see if there were any cameras that might have captured footage of the incident.  (*Id.* at 28-29).  At 10:36 a.m. on October 24, 2016, Ravines contacted D'Alessio. (*Id.* at 34).  However, D'Alessio informed Ravines later that day that there were no cameras in the area of the alleged incident.  (*Id.*).

On October 25, 2016, Plaintiff met with Ravines in the HR Office. (Stanciu Decl., Ex. 6).  Plaintiff testified in her deposition that Rodriguez was also present for this meeting (Pl. Dep. 70:4-7), but this is not corroborated by any other evidence in the record.  The parties agree that Ravines informed

Plaintiff that an investigation had been conducted into her claim and that they had yet to find any corroborating evidence.  (*Compare* Stanciu Decl., Ex. 6, *with* Pl. Dep. 70:8-17).  It is also undisputed that Ravines informed Plaintiff that he would continue to investigate the matter.  (*Compare* Stanciu Decl., Ex. 6, *with* Pl. Dep. 70:18-21).  Both parties agree that Plaintiff became emotional during the meeting and told Ravines details about her past.  (*Compare* Stanciu Decl., Ex. 6, *with* Pl. Dep. 71:9-14).  Plaintiff testified that she told Ravines that it upset her that "they needed something, footage on camera as evidence for them to do anything" (Pl. Dep. 71:22-25), to which Ravines reportedly responded that it was Plaintiff's word against the word of Blanco, Perdomo, and Plummer (*id.* at 72:5-9).  Ravines's notes indicate that he asked Plaintiff if she wanted to go home, and that Plaintiff declined the offer.  (Stanciu Decl., Ex. 6).  Plaintiff also testified that it was during this first meeting with Ravines that Ravines mentioned the possibility of switching Plaintiff's schedule, an idea that Plaintiff expressed she was not happy about.  (Pl. Dep. 86:20-87:2).

### 5.    The Second Incident of Harassment

On October 25, 2016, Plaintiff was sitting in the Housekeeping Office immediately after her meeting with Ravines when Nasser "Nash" Mouane, another of Defendant's employees, entered the office and grabbed Plaintiff's face.  (Def. Reply 56.1 ¶ 115).[3]  Plaintiff complained about the incident to

---

[3]    According to Plaintiff's affidavit and Plaintiff's opposition brief, Mouane claimed that he mistook Plaintiff for Jessica Santiago.  (*See* Pl. Aff. ¶ 16; Pl. Br. 4).  However, this is not reflected in Plaintiff's deposition, and is instead attributed to a later incident with a different harasser.  (*See* Pl. Dep. 127:6-21).

Williams, and then returned to the HR Office to report the incident.  (*Id.*).
Ravines informed both Plaintiff and Williams that he would immediately
conduct an investigation.  (Stanciu Decl., Ex. 7).  Given that Plaintiff was
scheduled to take vacation, Ravines told Plaintiff that he would have a
response for her by the time she returned to work.  (*Id.*; Pl. Dep. 79:10-16).
Plaintiff indicated that she wished to go home, and Williams and Ravines
permitted her to leave work.  (Stanciu Decl., Ex. 7; Pl. Dep. 79:5-9).  After his
meeting with Plaintiff, Ravines emailed D'Alessio and asked him to review
surveillance footage of the incident with Mouane.  (Augello Reply Decl., Ex. B at
36).  Santana and Williams also both reached out to Plaintiff in the evening of
October 25, 2016, to check in on her well-being.  (Stanciu Decl., Ex. 5; Augello
Reply Decl., Ex. B at 37, 39).  Plaintiff testified that, apart from those
conversations with Santana and Williams, she did not speak with anybody at
the Hotel between when she left on October 25, 2016, and when she returned
on October 31, 2016.  (Pl. Dep. 86:7-14).

### 6.    Defendant Continues to Respond to Plaintiff's Complaints

Following Plaintiff's meeting with Ravines on October 25, 2016, Ravines
and Rodriguez spoke with Williams about possibly coordinating Plaintiff's
schedule so that she would not have to work at the same time as Perdomo.
(Def. Reply 56.1 ¶ 19).  The three also discussed whether it would be possible
to ensure that Plaintiff and Perdomo worked on different floors, if they were
scheduled to work at the same time.  (*Id.*).  On October 27, 2016, Ravines
emailed Williams and asked her to send Blanco, Perdomo, and Plummer to the

HR Office later that day for further investigation.  (Stanciu Decl., Ex. 8).  There is evidence that Ravines personally interviewed Blanco at some point, but it is unclear when any such conversation occurred.  (Stanciu Decl., Ex. 9).  During that conversation, Blanco admitted to seeing Plaintiff but denied seeing Perdomo touch her.  (*Id.*).  Ravines also indicates in his sworn affidavit that Blanco, Perdomo, and Plummer were all advised that it was inappropriate to touch co-workers, and were reminded of the Hotel's sexual harassment policy, although he does not specify when such conversations occurred.  (Def. Reply 56.1 ¶ 12; Ravines Aff. ¶ 8).

On November 1, 2016, after returning to work from her vacation, Plaintiff went to the HR Office and spoke with Rodriguez about the two prior incidents. (Def. Reply 56.1 ¶ 20; Stanciu Decl., Ex. 10).  Rodriguez informed Plaintiff that while she could not discuss the incident with Mouane, as it was still being investigated, she could discuss the incident with Perdomo.  (Stanciu Decl., Ex. 10).  Plaintiff informed Rodriguez that she did not feel safe working at the Hotel, and that she was scheduled to work with Perdomo that coming weekend. (*Id.*).  In response, Rodriguez told Plaintiff that she had spoken with Williams about ensuring that Plaintiff and Perdomo would not be scheduled together, or would at least work on different floors.  (*Id.*).  Rodriguez explained that, because Perdomo was a union employee, the Hotel was unable unilaterally to change his schedule.  (*Id.*; Rodriguez Dep. 86:13-22).  Plaintiff then told Rodriguez that she did not feel safe, and that she could not remain at work anymore that day.  (Stanciu Decl., Ex. 10).

On November 4, 2016, Plaintiff emailed Turano, informing him about the incidents with Perdomo and Mouane and detailing her interactions with HR up to that point.  (Stanciu Decl., Ex. 11).  Plaintiff asked Turano for his help in devising a solution, and also expressed a fear of being "marked," after a housing coordinator asked why Plaintiff had taken Perdomo to HR.  (*Id.*).  Turano responded to Plaintiff's email, expressing his regret as to Plaintiff's situation and assuring her that he would speak with the HR team.  (*Id.*).  Plaintiff in turn informed Turano that Williams had reached out to her and asked her to come in for a meeting with HR.  (*Id.*).

That same day, Plaintiff met with Rodriguez and Williams to discuss the two incidents further.  (Augello Reply Decl., Ex. B at 6-7).  Rodriguez's notes of the conversation indicate that Rodriguez and Williams made efforts to comfort Plaintiff; that Rodriguez had spoken to Williams about trying to adjust the schedules; that Rodriguez offered Plaintiff the option of carrying a panic button with her; that Rodriguez gave Plaintiff the number for an employee help hotline; and that Rodriguez discussed with Plaintiff her desire to transfer to another of Defendant's properties in Los Angeles.  (*Id.*).  However, there is some dispute in the record as to what was discussed during this meeting.  Specifically, Plaintiff disputes three different parts of the conversation that are reflected in Rodriguez's notes.  *First*, Plaintiff disputes that she told Rodriguez and Williams that she had discussed the two incidents with her friends, and that her friends had told her to sue.  (Pl. Dep. 96:17-97:5).  *Second*, Plaintiff disputes that Rodriguez or anyone at the Hotel ever offered her a panic button.  (*Id.* at 97:9-

12

12).  And *third*, Plaintiff disputes that she ever said that her life coach was too busy to talk to her, or that her life coach would not be around until the following week.  (*Id.* at 97:20-22).  Otherwise, Plaintiff affirmed the accuracy of Rodriguez's notes recording the meeting.  (*Id.* at 97:23-98:2).

Later on November 4, 2016, Rodriguez followed up by email with Plaintiff and thanked her for coming in.  (Stanciu Decl., Ex. 12).  Rodriguez told Plaintiff that HR was still investigating the incident with Mouane, and asked Plaintiff to come in for a meeting with her and Ravines on November 8, 2016, at which the pair would provide Plaintiff with an update.  (*Id.*).  Rodriguez also encouraged Plaintiff to reach out to her or Ravines if she needed to speak with anyone, or to use the hotline number that she had been given.  (*Id.*).  As a final matter, Rodriguez asked Plaintiff to think over the weekend about whether she was really interested in going to Los Angeles, and said that they could discuss the option further at the November 8 meeting.  (*Id.*).  In a different email that same day, Rodriguez contacted Rhiela Arroyo, Director of Human Resources at the Millennium Biltmore Hotel in Los Angeles, and inquired as to whether the Housekeeping Floor Manager position was still available.  (*Id.*).  Arroyo confirmed that it was.  (*Id.*).

On November 5, 2016, Plaintiff informed Williams within an hour of her scheduled start time that she was too scared to come in to work that day. (Stanciu Decl., Ex. 13).  This was in violation of Defendant's policy requiring employees to inform supervisors that they would not be coming in at least two hours prior to a scheduled start time.  (Def. Reply 56.1 ¶ 29).  Plaintiff also told

Williams that she had asked a colleague to switch shifts with her, claiming that it was much easier for her to work in the evening. (Stanciu Decl., Ex. 13). Plaintiff's email to Williams was forwarded along to Ravines and White. (*Id.*). On November 7, 2016, Mouane received an Employee Communications Notice detailing his prior interaction with Plaintiff and warning him that any future similar incidents would result in termination. (Augello Decl., Ex. C).

On November 8, 2016, Plaintiff met with Ravines for their scheduled update. (Stanciu Decl., Ex. 14). Ravines's notes from the meeting reflect the following: Ravines informed Plaintiff that the results of the investigation into the Perdomo incident were inconclusive, based on the lack of surveillance footage and the statements of the witnesses. (*Id.*). Ravines also told Plaintiff that Mouane had acknowledged his inappropriate behavior and had been advised not to have any similar interactions with fellow employees. (*Id.*). Ravines informed Plaintiff that Mouane wished to apologize to her, but that Ravines had advised Mouane not to approach Plaintiff. (*Id.*). Plaintiff expressed that she did not feel safe in the workplace, to which Ravines offered the possibility of instituting a "buddy system," whereby Plaintiff could have another person accompany her during her shift. (*Id.*). Plaintiff did not express an interest in the idea. (*Id.*). Ravines also told Plaintiff that he planned to bring in a specialist to provide training on sexual harassment. (*Id.*). Plaintiff and Ravines discussed Plaintiff's interest in working in California, and Ravines informed Plaintiff that it was an option after she had completed six months with Defendant. (*Id.*). At some point in the conversation, Plaintiff told Ravines

14

that she intended to engage an attorney due to Defendant's failures in keeping her safe. (*Id.*). Finally, Plaintiff told Ravines that she could no longer work that day due to her fear, and told Ravines that she would contact him. (*Id.*).

Plaintiff disputed significant portions of Ravines's notes of their meeting during her deposition. *First*, Plaintiff testified that Ravines never told her that he intended to bring in a specialist for sexual harassment training. (Pl. Dep. 114:2-16). *Second*, Plaintiff claimed that she never told Ravines that she was intending to hire herself an attorney. (*Id.* at 114:18-24). *Third*, Plaintiff asserted that Ravines never offered her any sort of "buddy system." (*Id.* at 115:3-6). *Fourth*, although not framed as a dispute, Plaintiff recalled Ravines informing her that they were unable to remove Perdomo or change his schedule, and that they would therefore need to change Plaintiff's schedule instead. (*Id.* at 112:5-13; Compl. ¶ 27). Plaintiff testified that, prior to the November 8 meeting, she had been switching her shift to the night hours on her own initiative. (Pl. Dep. 112:14-21). However, after her meeting with Ravines on November 8, 2016, Plaintiff was officially changed to the night shift, and remained on the night shift for the duration of her employment with Defendant. (*Id.* at 113:9-17). Other than those four disputes, Plaintiff affirmed the accuracy of Ravines's recollection of the meeting. (*Id.* at 118:7-9).

On November 9, 2016, the day after her meeting with Ravines, Plaintiff emailed Ravines and informed him that she was still agitated and would not be coming in for work that day. (Stanciu Decl., Ex. 15). Plaintiff also requested a meeting with HR for the next day. (*Id.*). There is no evidence in the record as

to whether Plaintiff received a response to her email, or whether the requested meeting occurred.  However, there was a meeting on November 10, 2016, involving Rodriguez, Ravines, and Plummer, among others.  (Stanciu Decl., Ex. 16).  Plummer stated that he did not recall seeing Perdomo interact with Plaintiff on October 22, 2016.  (*Id.*).

After Plaintiff's conversation with Ravines on November 8, 2016, there was no further follow-up with Plaintiff about her desire to transfer to Defendant's property in Los Angeles.  (Rodriguez Dep. 101:23-102:7; Pl. Dep. 117:2-18).  This is despite the fact that the six-month probationary period that Ravines mentioned to Plaintiff expired in December.  (*See* Stanciu Decl., Ex. 14).  Plaintiff testified that she verbally informed Rodriguez that she remained interested in the position in Los Angeles, but that she never followed up afterward.  (Pl. Dep. 117:8-18).  Rodriguez, in her deposition, did not recall any conversation with Plaintiff about the Los Angeles position after her email of November 4, 2016.  (Rodriguez Dep. 101:23-102:7).

Beginning in November 2016 and continuing until her resignation in February 2017, Plaintiff ceased performing the parts of her job that required her to perform room checks.  (Def. Reply 56.1 ¶ 30).  Plaintiff was not disciplined for this failure to perform a part of her job in any manner.  (*Id.* at ¶ 31).  However, on December 13, 2016, Plaintiff did receive an Employee Communications Notice.  (Stanciu Decl., Ex. 17).  The Notice was the result of an "excessive number of sick calls" — specifically, that Plaintiff had called out sick thirteen times between the commencement of her employment with

Defendant in June 2016 and the time of the Notice.  (Stanciu Decl., Ex. 17).

Plaintiff claimed in her deposition that some of the days she called out were for

days that had been pre-approved by the manager who hired her, while the rest

were the result of her trauma from the two incidents.  (Pl. Dep. 124:23-126:24).

The Notice recites that it is non-disciplinary (Stanciu Decl., Ex. 17), and

Plaintiff testified that she did not lose pay or benefits as a result of the Notice,

nor was she demoted or terminated (Pl. Dep. 121:18-122:8).  However, the

Notice was the first step in Defendant's corrective action plan.  (Def. Reply 56.1

¶ 122).

### 7.   The Third Incident of Harassment

Plaintiff alleges that on or about February 4, 2017, Fernando Pegerro, a

linen runner at the Hotel, assaulted her while she was sitting at her desk.  (Pl.

Dep. 127:6-21; Compl. ¶ 33).  Specifically, Plaintiff alleges that Pegerro placed

a straw in between Plaintiff's breasts and then stroked the straw.  (Pl.

Dep. 127:6-21).  Pegerro then acted surprised and claimed that he had

mistaken Plaintiff for Jessica Santiago, a different employee.  (*Id.*).  Pegerro

apologized for the incident, but Plaintiff became frightened and hid herself in a

closet.  (*Id.* at 128:8-16).  While Plaintiff was in the closet, she texted Santana

to report the incident.  (*Id.* at 129:7-8).  Both Santana and Rondon came to the

closet and attempted to calm Plaintiff down, and Santana asked Plaintiff what

she wanted to do.  (*Id.* at 129:15-20).  Plaintiff responded that she wanted to go

home, and Santana escorted her out of the Hotel.  (*Id.* at 129:19-130:3).

Plaintiff never returned to the Hotel after the incident with Pegerro.  (Pl. Dep. 131:4-6).  In part, this was because Plaintiff had scheduled time off on the days that followed the third incident.  (*Id.* at 133:11-20).  Plaintiff testified that she gave a statement to HR about the incident, but she did not recall when she gave any such statement and there is no evidence of such a statement in the record.  (*Id.* at 131:18-132:13).  However, Williams texted Plaintiff on February 9, 2017, to see how Plaintiff was doing.  (Stanciu Decl., Ex. 5).  Ravines also emailed Plaintiff on February 10, 2017, and asked if Plaintiff would be able to come to the Hotel for a meeting on February 13, 2017, to discuss the incident with Pegerro.  (Pl. Dep. 132:20-133:3; Compl. ¶ 35).  Plaintiff informed Ravines that she was out of the office and that she would follow up later.  (Compl. ¶ 35; Ravines Aff. ¶ 22).  Ravines, however, suspended Pegerro without pay pending an investigation, and then reviewed video surveillance of the incident.  (Ravines Aff. ¶ 22).  Ravines claimed that the surveillance footage showed Pegerro reaching toward Plaintiff, but it did not show a straw or any touching.  (*Id.*).[4]  Rodriguez testified that she also reviewed the footage, and that it showed Pegerro coming upon Plaintiff from behind while she was seated at a desk, and then hugging her.  (Rodriguez Dep. 113:2-20).  Rodriguez did not recall there being any documentation placed in Pegerro's file regarding the incident.  (*Id.* at 117:2-16).

---

[4]     Although the parties attempted to provide the Court with a copy of the surveillance footage of the third incident, the footage was not in a format that the Court was able to access.  However, given the other evidence in the record, the Court is certain that the video footage would not alter the Court's findings in this Opinion.

On February 16, 2020, Plaintiff emailed Ravines, Rodriguez, and Turano with her resignation from her position with Defendant.  (Stanciu Decl., Ex. 18). Plaintiff's email outlined the three prior incidents and expressed her belief that HR had not done enough in response to the incidents.  (*Id.*).  Plaintiff also wrote that "[n]o solution ha[d] been created to make [her] feel safe in the work place," including that the staff had not been given a refresher on sexual harassment. (*Id.*).  Indeed, other than Jean Francois, a linen runner at the Hotel, testifying that he remembered attending a sexual harassment training a couple of years prior to his deposition (Stanciu Decl., Ex. 23 ("Francois Dep.") at 29:6-17), there is no evidence that Defendant had its staff attend a sexual harassment training in response to Plaintiff's complaints.  Given the absence of any further information from Plaintiff, or other corroborating information, Defendant was required to reinstate Pegerro due to his status as a union member.  (Def. Reply 56.1 ¶ 43).  Pegerro was advised that his conduct was inappropriate.  (*Id.*).

## B.    Procedural Background

Plaintiff initiated this action with the filing of her Complaint on June 22, 2018.  (Dkt. #1).  Defendant filed its Answer on August 24, 2018.  (Dkt. #7). On August 27, 2018, the case was automatically referred to the Court-annexed mediation program.  (Dkt. #9).  A mediation was held on November 20, 2018 (Minute Entry for November 26, 2018), but the mediation talks were unsuccessful (Dkt. #13).  On December 6, 2018, the Court scheduled an initial pretrial conference for January 31, 2019.  (*Id.*).  However, that conference was adjourned due to illness (Dkt. #17), and the Court instead endorsed a Case

Management Plan and permitted the parties to proceed with discovery (Dkt. #18).

On August 8, 2019, the parties appeared for a post-fact discovery conference, which resulted in the parties returning to mediation. (Minute Entry for August 8, 2019). However, the parties advised the Court on September 30, 2019, that mediation was once again unsuccessful. (Dkt. #26). Plaintiff also informed the Court of her intent to bring a motion for sanctions against Defendant. (*Id.*). The Court granted Plaintiff leave to file a letter further explaining her position in favor of sanctions, and also ordered the parties to submit a proposed schedule for summary judgment briefing by October 15, 2019. (Dkt. #27). On October 8, 2019, Plaintiff requested a conference to discuss an anticipated motion for spoliation sanctions relating to Defendant's alleged failure to produce video surveillance of the Mouane incident. (Dkt. #28). Defendant responded by letter on October 11, 2019. (Dkt. #31). On October 14, 2019, both parties requested an extension for the submission of their proposed summary judgment briefing schedule. (Dkt. #32). In response, the Court gave the parties until October 22, 2019, to submit their proposed schedule. (Dkt. #33). On October 15, 2019, the Court also ordered the parties to appear on October 17, 2020, for a telephonic conference regarding Plaintiff's motion for spoliation sanctions. (Dkt. #34). At the telephonic conference, the Court scheduled Defendant's opposition to Plaintiff's sanctions motion, as well as Plaintiff's reply. (Minute Entry for October 17, 2019). On October 22, 2019, the parties submitted their proposed schedule for

summary judgment briefing (Dkt. #35), which the Court so-ordered on October 23, 2019 (Dkt. #36).

On October 31, 2019, Defendant filed its opposition to Plaintiff's sanctions motion.  (Dkt. #37).  Plaintiff submitted her reply on November 19, 2019.  (Dkt. #41).  On November 21, 2019, the Court denied the motion for sanctions.  (Dkt. #42).  On December 6, 2019, Defendant attempted to file its motion for summary judgment, with accompanying memorandum, affidavits, and a Local Rule 56.1 Statement of Undisputed Facts.  (Dkt. #43).  However, due to a docketing error, the motion and its accompanying materials were not properly filed until January 23, 2020.  (Dkt. #50-53).  On January 24, 2020, Plaintiff filed her opposing papers (Dkt. #54-56), and on January 31, 2020, Defendant filed its reply papers (Dkt. #57-59).

## DISCUSSION

### A.    Applicable Law

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[5]  A genuine

---

[5]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word – genuine 'issue' becomes genuine 'dispute.' 'Dispute better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be

dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246. 252 (2d Cir. 2001).  Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

---

guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)). "Though [the Court] must accept as true the allegations of the party defending against the summary judgment motion … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks*, 593 F.3d at 166. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "If the evidence is merely colorable … or is not significantly probative … summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). It should also be noted that "the principles governing admissibility of evidence do not change on a motion for summary judgment. … [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case

where … the merits turn on a dispute as to the employer's intent." *Gorzynski*, 596 F.3d at 101 (internal quotation marks omitted) (quoting *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008)). "Where an employer acted with discriminatory intent, 'direct evidence of that intent will only rarely be available, so … affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* Nevertheless, "[f]or a plaintiff to survive a motion for summary judgment in a discrimination case, she must offer concrete particulars to substantiate her claim." *Stathalos* v. *Gala Res., LLC*, No. 06 Civ. 13138 (RLC), 2010 WL 2024967, at *4 (S.D.N.Y. May 21, 2010) (internal citations and quotation marks omitted). "The summary judgment rule would be rendered sterile … if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri* v. *Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

**B.   The Court Denies Summary Judgment as to Plaintiff's Hostile Work Environment Claims**

Plaintiff has brought claims alleging a hostile work environment under Title VII, the NYSHRL, and the NYCHRL. (Pl. Opp. 7). Defendant challenges these claims on three separate grounds: (i) Plaintiff has failed, as a matter of law, to demonstrate that the alleged incidents constitute a hostile work environment (Def. Br. 15-16); (ii) even if the alleged incidents did constitute a hostile work environment, Defendant cannot be held liable for the actions of non-supervisory employees (*id.* at 9); and (iii) regardless of either of the above, Defendant is entitled to rely on the *Faragher/Ellerth* affirmative defense against

the Title VII, NYSHRL, and NYCHRL claims (*id.* at 3-4).  The Court addresses

each argument in turn.

>    1.   **Plaintiff Has Raised a Triable Issue as to Whether She Was Subjected to a Hostile Work Environment**

Title VII provides that "it shall be an unlawful employment practice for an

employer … to discharge any individual, or otherwise to discriminate against

any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-2(a)(1).[6]  "When the workplace is

permeated with discriminatory intimidation, ridicule, and insult [based on,

*inter alia*, sex] that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive work environment, Title VII is

violated."  *Schiano* v. *Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir.

2006) (quoting *Harris* v. *Forklift Sys., Inc.*, 501 U.S. 17, 21 (1993)).  In order to

prove the existence of a hostile work environment, a plaintiff must show both

(i) that the alleged behavior was "severe or pervasive enough to create an

*objectively* hostile or abusive work environment"; and (ii) that the plaintiff

"*subjectively* perceive[d] that environment to be abusive."  *Duch* v. *Jakubek*,

588 F.3d 757, 762 (2d Cir. 2009) (emphasis added) (quoting *Feingold* v. *New*

---

[6]     Although "[h]ostile work environment claims under both Title VII and the NYSHRL are governed by the same standard," *Summa* v. *Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013), claims under the NYCHRL require a much lower standard to survive summary judgment, *see Bermudez* v. *City of New York*, 783 F.Supp.2d 560, 579 (S.D.N.Y. 2011). However, because the Court finds that Plaintiff's hostile work environment claims survive summary judgment according to the higher standard imposed by Title VII, the Court focuses its analysis on that statute and does not, in this section, separately analyze her NYCHRL claim.

*York*, 366 F.3d 138, 150 (2d Cir. 2004)); *accord Fox* v. *Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019).

"On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*'" *Schiano*, 445 F.3d at 600 (emphasis in original) (quoting *Whidbee* v. *Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)).  In making this determination, the court, assessing the totality of the circumstances, examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cristofaro* v. *Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (quoting *Pucino* v. *Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)).  The Second Circuit has cautioned that "hostile work environment claims present 'mixed questions of law and fact' that are 'especially well-suited for jury determination,' and that "summary judgment is appropriate only where application of the law to … undisputed facts … reasonably support[s] only one ultimate conclusion."  *Schiano*, 445 F.3d at 605 (internal brackets omitted) (quoting *Richardson* v. *N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437-38 (2d Cir. 1999)).  Moreover, "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean

that employers are free from liability in all but the most egregious of cases." *Id.*
at 606 (quoting *Richardson*, 180 F.3d at 439).

With that said, the Second Circuit has drawn a line between "complaints
of sexual assaults; other physical contact, whether amorous or hostile, for
which there is no consent express or implied; uninvited sexual solicitations;
intimidating words or acts; and obscene language or gestures" — which are
actionable under Title VII — and "the occasional vulgar banter, tinged with
sexual innuendo, of coarse or boorish workers," which is not.  *See Russo* v. *N.Y.*
*Presbyterian Hosp.*, 972 F. Supp. 2d 429, 447 (E.D.N.Y. 2013) (internal
brackets omitted) (quoting *Redd* v. *N.Y. Div. of Parole*, 678 F.3d 166, 177 (2d
Cir. 2012)).  Moreover, "[i]solated incidents generally will not suffice to establish
a hostile work environment unless they are extraordinarily severe." *Id.* (quoting
*Kaytor* v. *Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010)).  And of course,
"[a] plaintiff may only recover on a hostile work environment claim if the hostile
work environment occurs because of [that] employee's protected characteristic,
such as her gender." *Id.* (citing *Rivera* v. *Rochester Genesee Reg'l Transp.*
*Auth.*, 702 F.3d 685, 693 (2d Cir. 2012)).

As evidence that she was subjected to a hostile work environment,
Plaintiff points to both what she perceived to be verbal harassment as well as
three incidents of physical harassment.  (Pl. Opp. 10).  In terms of the alleged
verbal harassment, Plaintiff specifically references: (i) on her first day, a
Housekeeping Coordinator asked Plaintiff whether she would be returning to
work the following day, given that Plaintiff's predecessor — also a

woman — had quit after her first day; (ii) Plaintiff's co-workers frequently discussed sex in the workplace, including one instance where three employees were watching pornographic videos on their phones and discussing fellatio; and (iii) Santana repeatedly referred to an African American female employee as "BBD," which stands for "Big Black Dick." (*Id.*).

Resolving all ambiguities and drawing all permissible inferences in Plaintiff's favor, the Court cannot find that a reasonable juror would view any of the above as evidence of a hostile work environment. As an initial matter, although the Coordinator's statement may have been inappropriate or lacked social tact, it was far too innocuous to lead a reasonable juror to believe that it would have worsened the working conditions of a reasonable employee. *See Schiano*, 445 F.3d at 600. The sexual banter that Plaintiff has alleged occurred also cannot give rise to a hostile work environment claim, primarily because Plaintiff has failed to adduce any admissible evidence that the banter was directed at her. Santana's nickname for the unidentified African American employee, crass as it may be, indisputably had nothing to do with Plaintiff or Plaintiff's status as a woman. Similarly, although Plaintiff was present for the sexually explicit conversation involving Santiago, Frazier, and the unnamed houseman, there is little evidence that the conversation occurred because of or was directed at Plaintiff. At most, the record supports the fact that the three interlocuters were amused by Plaintiff's discomfort with the content of the conversation. (Soto Aff. ¶ 7). However, a plaintiff's incidental involvement in workplace sexual banter does not constitute a hostile work environment claim.

*See Vito* v. *Bausch & Lomb Inc.*, 403 F. App'x 593, 596 (2d Cir. 2010) (summary order) (holding that plaintiff's witnessing of a co-worker flicking his tongue up and down in the direction of another co-worker, or seeing that a note was placed on a female co-worker's back identifying her as "property," did not create a hostile work environment).

The three incidents of physical harassment are a different story. Although Defendant makes a bold attempt to cast Plaintiff's allegations in spare, neutral terms (*see* Def. Br. 16 ("[O]ne employee may have touched Ms. Soto's side and another touched her face and a third allegedly inserted a straw into her shirt.")), Defendant cannot disguise the severity of the incidents at issue.  In particular, Plaintiff has characterized the incident with Mouane as Mouane grabbing her by the face "as if he was going to kiss me, and then shov[ing] my face away from him." (Stanciu Decl., Ex. 18).  Even more grotesquely, Plaintiff has claimed that the incident with Pegerro involved Pegerro inserting a straw into her cleavage and then "perform[ing] a stroking motion in and out of my breasts." (*Id.*).  Especially given Plaintiff's description of the third incident, the Court believes that a reasonable jury could find that Plaintiff was subjected to conduct that was sufficiently severe as to be objectively hostile or abusive.  *See Redd*, 678 F.3d at 180 (explaining that "[d]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment").  Indeed, the Court finds it notable that Defendant ignores the third incident during its effort to downplay Plaintiff's

allegations.  (*See* Def. Br. 16 (describing the first and second incidents as "not severe," and not mentioning the third incident)).

Moreover, the Court finds that Defendant's citations to authority are unpersuasive.  (*See* Def. Br. 16 (citing *Vito*, 403 F. App'x 593, and *Quinn* v. *Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998))).  In *Vito*, the plaintiff alleged that one individual pushed against the back of a chair that she was sitting in and touched part of her back and side, and on two other occasions touched her shoulder, while a different individual's hand may have touched her shoulder and then slipped down to touch her breast.  *See* 403 F. App'x at 596-97.  The Second Circuit held that neither individual's conduct could sustain a hostile work environment claim.  *See id.*  In *Quinn*, Plaintiff alleged that an employee had on one occasion told her that she had been voted the "sleekest ass" in the office, and on another occasion had deliberately touched her breasts with papers that he was holding in his hand.  *See* 159 F.3d at 768.  As with *Vito*, the Second Circuit held that this alleged conduct was not sufficiently severe to give rise to a hostile work environment claim.  *See id.*  Here, Plaintiff has alleged conduct that exceeds what was alleged in either *Vito* or *Quinn* — specifically, that one co-worker aggressively grabbed her face as if to kiss her, and that another placed a straw in between her breasts and then simulated sexual acts.  (Stanciu Decl., Ex. 18).  Thus, neither case requires the Court to grant summary judgment here.

Finally, insofar as Defendant argues that the alleged conduct did not occur because of her sex, the Court finds that the sexual nature of both the

second and third incident preclude summary judgment on that basis.  Given
that there is no argument that Plaintiff did not subjectively perceive her
workplace as abusive, the Court finds that a reasonable jury could find that
Plaintiff was subjected to a hostile work environment.

### 2. Plaintiff Has Raised a Triable Issue as to Whether the Hostile Work Environment May Be Imputed to Defendant

In addition to raising a triable issue as to whether she was subjected to a
hostile work environment, in order to survive summary judgment, Plaintiff
must also show "that there is a specific basis for imputing the conduct creating
the hostile work environment to the employer." *Duch*, 588 F.3d at 762.  This is
true for Title VII, the NYSHRL, and the NYCHRL, although different standards
apply for each statute.  *See, e.g.*, *Int'l Healthcare Exch., Inc.* v. *Global Healthcare
Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (explaining that "courts
have applied a stricter standard under the state and local human rights laws
with regard to the imputation of liability to an employer"); *see also Swiderski* v.
*Urban Outfitters, Inc.*, No. 14 Civ. 6307 (JPO), 2017 WL 6502221, at *7
(S.D.N.Y. Dec. 18, 2017).  Given the differing standards, the Court will address
whether Plaintiff has raised a triable issue as to Defendant's liability under
each of the relevant statutes.

It is undisputed that neither Perdomo, Mouane, nor Pegerro was a
supervisory employee.  Therefore, Defendant can only be held liable for its own
negligence.  *Duch*, 588 F.3d at 762.  In order to establish Defendant's liability
under Title VII, Plaintiff must demonstrate that Defendant either (i) "failed to
provide a reasonable avenue for complaint" or (ii) "knew, or in the exercise of

reasonable care should have known, about the harassment [and] yet failed to take appropriate remedial action." *Id.* (quoting *Howley* v. *Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)).

There is no genuine dispute that Defendant provided a reasonable avenue for complaint. The Second Circuit has previously recognized that "the existence of an anti-harassment policy with complaint procedures is an important consideration" in determining whether an employer has provided a reasonable avenue for complaint. *See Scoppettone* v. *Mamma Lombardi's Pizzico, Inc.*, 523 F. App'x 73, 75 (2d Cir. 2013) (summary order) (quoting *Leopold* v. *Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001)). And although "the mere existence of sexual harassment complaint procedures does not immunize [a] defendant," *Wahlstrom* v. *Metro-N. Commuter R.R. Co.*, 89 F. Supp. 2d 506, 523 (S.D.N.Y. 2000) (internal brackets omitted) (quoting *Crisonino* v. *N.Y.C. Hous. Auth.*, 985 F. Supp. 385, 390 (S.D.N.Y. 1997)), the Second Circuit has emphasized that the relevant inquiry is "whether defendants 'provided *no* reasonable avenue of complaint,'" *Duch*, 588 F.3d at 762-63 (emphasis in original) (quoting *Distasio* v. *Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)). It is undisputed that Defendant maintained an anti-harassment policy that provided multiple channels for bringing complaints (Augello Decl., Ex. B); indeed, Plaintiff made use of this policy repeatedly when she complained about the various physical incidents to her supervisors (Def. Reply 56.1 ¶¶ 98, 102). Therefore, Plaintiff cannot establish Defendant's liability based on its failure to provide a reasonable avenue of complaint. *See Scoppettone*, 532 F. App'x at 75

(finding that defendant had provided a reasonable avenue of complaint because it had in place a sexual harassment policy with multiple available channels); *Duch*, 588 F.3d at 763 (finding same).

However, Plaintiff can still survive summary judgment on her Title VII claim if she can show that Defendant failed to take appropriate remedial action when confronted with Plaintiff's complaints.  *See Duch*, 588 F.3d at 763.[7]  The reasonableness of a defendant's response is "to be assessed from the totality of the circumstances," considering "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment."  *Id.* at 766.  "If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate."  *Id.* (quoting *Gallagher* v. *Delaney*, 139 F.3d 338, 348 (2d Cir. 1998)).

Defendant urges the Court to find that, based on the record of undisputed facts before it, Defendant's response was reasonable.  (*See* Def. Br. 10-12).  And indeed, the record shows that Defendant took many commendable steps in response to Plaintiff's various complaints.  Upon receiving Plaintiff's complaint about the Perdomo incident, Rondon immediately notified Williams and Santana, who in turn notified Ravines.  (Stanciu Decl., Ex. 1).  White directed Santana to interview Blanco, Perdomo, and Plummer immediately (Augello Reply Decl., Ex. B at 19), while Ravines attempted to

---

[7]     Defendant does not contest that it knew about the harassment, eliminating Plaintiff's obligation to raise a triable issue as to that element at this stage.

discern whether there was any security camera footage of the incident (*id.* at 34).  Even after the initial investigation had concluded with no corroborating evidence of Plaintiff's claim, HR personnel continued to interview the men involved to try and determine what had occurred.  (Stanciu Decl., Ex. 9; *id.*, Ex. 16).  Defendant was similarly prompt in its investigation of the Mouane incident; Ravines immediately emailed D'Alessio and asked him to pull and review any surveillance footage of the incident.  (Augello Reply Decl., Ex. B at 36).

Apart from investigating Plaintiff's claims, the record also indicates that Defendant took several affirmative steps to discipline the harassers and protect Plaintiff.  In response to the Perdomo incident, Blanco, Perdomo, and Plummer were advised that it was inappropriate to touch co-workers and were reminded of Defendant's sexual harassment policy.  (Ravines Aff. ¶ 8).  Additionally, Ravines, Rodriguez, and Williams looked into whether it would be possible to modify Plaintiff's or Perdomo's schedules so that Plaintiff would not have to worry about being near Perdomo again.  (*See* Pl. Dep. 86:20-87:2, 112:5-13; Def. Reply 56.1 ¶ 19; Stanciu Decl., Ex. 10).  As for the Mouane incident, Mouane received an Employee Communications Notice informing him that any future similar incidents would result in termination.  (Augello Decl., Ex. C). Finally, HR responded to the Pegerro incident by immediately suspending Pegerro without pay while they conducted their investigation.  (Ravines Aff. ¶ 22).

The inquiry at this stage, however, is not whether Defendant acted promptly or took some measures, but whether a reasonable jury could find that Defendant did not respond in a reasonable manner. *See Duch*, 588 F.3d at 766 ("If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate."). And it is clear, based on the record before the Court, that the reasonableness of Defendant's response is best left for the jury.

It is undeniable that Defendant took some action, but a reasonable jury could find that a reasonable response required more. And while Defendant asserts that it took a variety of additional measures, such as offering Plaintiff a panic button (Augello Reply Decl., Ex. B at 6-7); offering Plaintiff a buddy system (Stanciu Decl., Ex. 14); and bringing in a specialist for sexual harassment training (*id.*), Plaintiff counters that none of these remedial measures materialized or was even offered (Pl. Dep. 97:9-12, 114:2-16, 115:3-6; Stanciu Decl., Ex. 18). Moreover, the record indicates that Defendant could have taken other measures, such as sending Perdomo home pending the investigation (*see* White Dep. 48:25-49:9), or altering Perdomo's schedule after a conversation with the union representative (*see* Def. Reply 56.1 ¶ 73). Given the many disputes in the record, it would be inappropriate for the Court to find, as a matter of law, that Defendant's response was reasonable. Accordingly, the Court leaves to a jury the question of whether Defendant should be held liable for its employees' conduct under Title VII.

35

As previously mentioned, the NYSHRL carries a stricter standard for determining whether an employer can be held liable for an employee's conduct. Specifically, "an employer cannot be held liable under state law for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *E.E.O.C.* v. *Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 520 (E.D.N.Y. 2014) (internal quotation marks and brackets omitted) (quoting *Forrest* v. *Jewish Guild for the Blind*, 3 N.Y.3d 295, 311 (2004)). "Condonation … contemplates a knowing, after-the-fact forgiveness or acceptance of an offense." *Id.* at 521-22 (quoting *State Div. of Human Rights on Complaint of Greene* v. *St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985)). "Alternatively, an employer's calculated inaction in response to discriminatory conduct, may as readily as affirmative conduct, indicate condonation." *Id.* at 522 (quoting *Guzman* v. *Macy's Retail Holdings*, No. 09 Civ. 4472 (PGG), 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010)).

As with its challenge to imputation under Title VII, Defendant claims that it cannot be held liable under the NYSHRL because it took "swift investigative action, took remedial/corrective action, stayed in regular communication with Plaintiff[,] and offered her several measures to ensure she felt safe in the workplace." (Def. Br. 14). Putting aside that some of the above, as already noted, is disputed, there is still ample room to conclude from the record that Defendant condoned the harassers' actions, either through forgiveness and acceptance or calculated inaction. Indeed, the circumstances before the Court closely resemble those the district court faced in *Suffolk Laundry Services*,

where even though the defendants "took some proactive measures by telling [the harasser] not to touch any of the [plaintiffs] and meeting with each of the [plaintiffs] and assuring several of them that they should come directly to [a supervisor] in the future with any complaints," there was still "sufficient evidence from which a jury could find that [the defendant] … condoned the actions of [the harasser]." 48 F. Supp. 3d at 522. This was in part because supervisors told several of the plaintiffs that they did not believe them and would not believe them over their harasser, and in part because the harasser was not fired or otherwise punished. *See id.*

Similarly to *Suffolk Laundry Services*, Plaintiff testified that Ravines told her during their meeting on October 25, 2016, that it was her word against Blanco's, Perdomo's, and Plummer's, and there were "three of them and … only one of [her]." (Pl. Dep. 72:5-9). Defendant also took no disciplinary action against Perdomo for his alleged harassment of Plaintiff. (Def. Reply 56.1 ¶ 11). Based on the Defendant's alleged actions — and more relevantly, Defendant's alleged inactions — a reasonable jury could find that Defendant condoned Plaintiff's harassers. Therefore, Defendant may be liable for a hostile work environment under the NYSHRL.

Finally, the NYCHRL provides that "[a]n employer will be held liable … for the discriminatory acts of non-supervisory co-workers … if … the employer knew of the employee's … discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action." *Torres* v. *City of New York*, No. 18 Civ. 3644 (LGS), 2019 WL 1765223, at *5 (S.D.N.Y.

Apr. 22, 2019).  There is no question that Defendant knew of its employees'
discriminatory conduct, and for the many reasons already discussed, a
reasonable jury could find that Defendant either acquiesced in that conduct or
failed to take immediate and appropriate corrective action.  Defendant offers no
citations to authority to persuade the Court otherwise.  Accordingly, Defendant
cannot escape liability under the NYCHRL, and a jury will determine whether
Perdomo's, Mouane's, and Pegerro's conduct can be imputed to Defendant.

### 3.   Defendant Has Not Met the Requirements of the *Faragher/Ellerth* Defense

Defendant's final challenge to Plaintiff's hostile work environment claims
is that Defendant can avail itself of the so-called *Faragher/Ellerth* defense.
(Def. Br. 3-4).  The defense allows an employer to defeat a hostile work
environment claim if it can show: (i) "that the employer exercised reasonable
care to prevent and correct promptly any sexually harassing behavior"; and
(ii) "that the plaintiff employee unreasonably failed to take advantage of any
preventive or corrective opportunities provided by the employer or to avoid
harm otherwise." *Stofsky* v. *Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 295
(S.D.N.Y. 2009).

As a preliminary matter, Defendant devotes four pages to arguing that
the *Faragher/Ellerth* defense applies to NYCHRL claims.  (Def. Br. 5-9).
However, it is settled law, affirmed by the New York Court of Appeals and
recognized by the Second Circuit, that the affirmative defense is inapplicable in
the NYCHRL context.  *See Zakrzewska* v. *New School*, 620 F.3d 168, 170 (2d
Cir. 2010) (noting that, following certification of the issue to the New York

Court of Appeals, the New York high court had confirmed that the defense does not apply under the NYCHRL).  Moreover, it is unclear whether the defense applies to NYSHRL claims.  *See Gorman* v. *Covidien, LLC*, 146 F. Supp. 3d 509, 521 n.3 (S.D.N.Y. 2015).

Regardless of whether the *Faragher/Ellerth* defense applies to NYSHRL claims, it is clear that Defendant cannot satisfy the second prong of the defense on summary judgment.  It is beyond question that Plaintiff took full and repeated advantage of Defendant's internal complaint procedures.  (*See, e.g.*, Def. Reply 56.1 ¶¶ 98, 102, 115; Stanciu Decl., Ex. 6, 11).  Moreover, Plaintiff took proactive efforts to shield herself from harm by switching her schedule with a co-worker, so as to avoid Perdomo.  (Stanciu Decl., Ex. 13).  Finally, insofar as Defendant argues that it offered Plaintiff use of a panic button and a buddy system, both facts are disputed and at this stage in the proceedings the Court must construe the facts in the light most favorable to Plaintiff.  Given this record, no reasonable jury could find that Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant.  Accordingly, the Court declines to grant Defendant summary judgment on any of Plaintiff's hostile work environment claims.

## C.     The Court Denies Summary Judgment as to Plaintiff's Constructive Discharge Claims

Plaintiff has brought claims that she was constructively discharged under Title VII, the NYSHRL, and the NYCHRL.  (Pl. Opp. 22).  "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is

39

forced to quit involuntarily." *Terry* v. *Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003) (citations omitted).  "The inquiry is objective:  Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police* v. *Suders*, 542 U.S. 129, 141 (2004).

Work conditions are "intolerable" if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *Whidbee*, 223 F.3d at 73 (quoting *Chertkova* v. *Ct. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)).  Constructive discharge claims face a "demanding" standard, *Miller* v. *Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (summary order), "even higher than that required to prevail on a hostile environment claim," *Mandel* v. *Champion Int'l Corp.*, 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005).  Finally, constructive discharge claims require a showing of intent.  *See Creacy* v. *BCBG Max Azria Grp., LLC*, No. 14 Civ. 10008 (ER), 2017 WL 1216580, at *12 (S.D.N.Y. Mar. 31, 2017).  However, this does not require a showing that the employer had the specific intent to force an employee to quit; instead, "a plaintiff needs to 'at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective.'" *Id.* (internal quotation marks omitted) (quoting *Petrosino* v. *Bell Atl.*, 385 F.3d 210, 229-30 (2d Cir. 2004)).  "Therefore, … a plaintiff need only establish … that there remains a genuine issue of material fact as to whether a defendant acted deliberately in engaging in conduct that created the workplace conditions at issue." *Id.*

In its opening brief, Defendant challenges the constructive discharge claims merely by noting that the standard for constructive discharge is higher than that for hostile work environment, and then citing to numerous cases finding that there was insufficient evidence to support a hostile work environment claim.  (Def. Br. 18-20).  This strategy does little for Defendant where, as here, the Court has found that Plaintiff's hostile work environment claims survive summary judgment.  Moreover, in its reply, Defendant argues that "there is no indication that Defendant deliberately intended" to cause Plaintiff's resignation.  (Def. Reply 9).  But as already noted, that is not the relevant inquiry for a constructive discharge claim.  *See Creacy*, 2017 WL 1216580, at *12.

Instead, just as Plaintiff has adduced enough evidence to establish a genuine dispute of material fact as to her hostile work environment claims, she has done so for her constructive discharge claims.  Drawing all inferences and resolving all ambiguities in Plaintiff's favor, a reasonable juror could find that a reasonable person, facing three separate incidents of physical harassment in the span of approximately four months and seeing no discernable action taken against at least one of the harassers, would have found her working conditions so intolerable that she felt compelled to resign.  This is especially so given the severity of the final incident of harassment.

As for the question of intent, a reasonable jury could look at the evidence that Defendant did not reprimand Perdomo (Def. Reply 56.1 ¶ 11), nor make any perceivable effort to alter his schedule (*id.* at ¶ 73), nor mandate any

sexual harassment training for its staff (Stanciu Decl., Ex. 18), and find that Defendant deliberately made choices that led to the intolerable working conditions.  The Court's finding is in line with both this Court's prior decision and the decisions of sister courts.  *See, e.g.*, *Creacy*, 2017 WL 1216580, at *13 (finding that a reasonable employee would have felt compelled to quit her job if she was repeatedly harassed and did not feel that her employer was doing enough to protect her wellbeing); *Pryor* v. *Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 262 (S.D.N.Y. 2014) (finding a genuine dispute as to whether a reasonable person in plaintiff's position would have felt obliged to resign after an employee subjected the plaintiff to sexual advances and made several forcible attempts to kiss her); *Copantitla* v. *Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 301 (S.D.N.Y. 2011) ("[T]he Court cannot say that no reasonable jury would find that being rubbed with a supervisor's genitals, even if for ten seconds, would cause [the plaintiff's] working conditions to be such that he would feel compelled to resign.").  Defendant's motion for summary judgment as to Plaintiff's constructive discharge claims is denied.

## D.  The Court Grants Summary Judgment as to Plaintiff's Retaliation Claims

As a final matter, Plaintiff alleges that Defendant took numerous steps against her in retaliation for her complaints of harassment, and brings retaliation-based claims under Title VII, the NYSHRL, and the NYCHRL.  (Pl. Opp. 16, 22).  Retaliation claims under all three statutes are analyzed under the three-part burden-shifting test set out in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-05 (1973).  *See Hicks* v. *Baines*, 593 F.3d 159, 164 (2d Cir.

2010); *United States* v. *N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 402 (S.D.N.Y. 2018).  In the first step — the only step Defendant meaningfully challenges in its briefing (*see* Def. Br. 20-22; Def. Reply 6-7) — a plaintiff must establish a *prima facie* case of retaliation by showing: (i) "participation in a protected activity"; (ii) "that the defendant knew of the protected activity"; (iii) "an adverse employment action"; and (iv) "a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164. "The plaintiff's burden in this regard is '*de minimis*,' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Id.* (quoting *Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Defendant does not contest that Plaintiff engaged in protected activity and that Defendant was aware of the protected activity.  (Def. Br. 22). However, the Court understands Defendant's briefing to contest whether Plaintiff suffered any adverse employment actions.  (Def. Reply 6-7).  For the purpose of establishing a *prima facie* retaliation case under Title VII and the NYSHRL, *see Summa*, 708 F.3d at 125, adverse employment actions are "those that are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d at 403 (quoting *Hicks*, 593 F.3d at 165).  However, the anti-retaliation provisions of the two laws "protect[ ] an individual not from all retaliation, but from retaliation that produces an injury or harm." *Fincher* v.

*Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 67 (2006)).  The Supreme Court has emphasized that in finding adverse actions, it requires "*material* adversity because [it] believe[s] it is important to separate significant from trivial harms."  *White*, 548 U.S. at 68 (emphasis in original).

In her opposition, Plaintiff seems to claim that virtually every event that occurred following her original complaint qualifies as an adverse employment action.  (*See* Pl. Opp. 18-20).  Specifically, Plaintiff points to the following as adverse employment actions: (i) Defendant's failure to change Perdomo's shift after the first incident; (ii) Defendant's change of Plaintiff's schedule to the night shift; (iii) Defendant's failure to transfer her to Defendant's hotel in Los Angeles; (iv) Defendant's issuance of a write-up to Plaintiff regarding her excessive absences; and (v) Rondon's discouragement on November 6, 2016, of Plaintiff's desire to speak directly with Turano.  (*See id.*).

However, almost all of the above events fail to qualify as adverse actions.  *First*, Defendant's failure to change Perdomo's shift cannot qualify as an adverse employment action.  "Affirmative efforts to punish a complaining employee are at the heart of any retaliation claim."  *Fincher*, 604 F.3d at 721 (quoting *Thomlison* v. *Sharp Elecs. Corp.*, No. 99 Civ. 9539 (CM), 2000 WL 1909774, at *4 (S.D.N.Y. Dec. 18, 2000)).  Defendant's failure to change Perdomo's shift was not an affirmative effort — it merely preserved the *status quo ante*.  This is not enough to be materially adverse.  *Cf. id.* (holding that an employer's failure to investigate a complaint was not an adverse action because

44

the plaintiff's "situation in the wake of her having made the complaint [was] the same as it would have been had she not brought the complaint"). While Defendant's failure to change Perdomo's shift "would hardly provide a positive incentive to lodge ... a further challenge," a reasonable employee would not see it as "a threat of future harm." *Id.*

*Second*, the record before the Court cannot support the theory that Plaintiff's change to the night shift constituted an adverse action. This is because it is undisputed that Plaintiff not only voluntarily changed her schedule to the night shift prior to any action by Defendant, but also told Defendant that she preferred to work the night shift. (*See* Stanciu Decl., Ex. 13). Therefore, even if Plaintiff did later express dissatisfaction with working the night shift, a reasonable jury could not find that the schedule change would dissuade a reasonable employee from bringing a complaint of discrimination.

*Third*, Plaintiff's receipt of the write-up concerning her absences in December 2016 also cannot amount to an adverse action. It is undisputed that Plaintiff was absent on all the dates in question (*see* Pl. Dep. 124:23-125:17, 126:6-15); that the write-up was expressly non-disciplinary (*see* Stanciu Decl., Ex. 17); and that Plaintiff suffered no consequences as a result of the write-up (*see* Pl. Dep. 121:18-122:8). And while it is also undisputed that the issuance of the write-up represented the first step in Defendant's corrective action plan (*see* Def. Reply 56.1 ¶ 122), there is no evidence showing that the write-up "represented a departure from [Defendant's] normal disciplinary practices."

45

*See Rivera* v. *Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26 (2d Cir. 2014).  Thus, given that there was good reason for the write-up, and there were no consequences to the write-up, a reasonable employee could not have found it materially adverse.  *See Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 569 (2d Cir. 2011) (holding that the initiation of fact-finding investigations did not constitute adverse action because the employer had good reason for its action and the action did not lead to any disciplinary consequences).

*Fourth*, no reasonable jury could find that Plaintiff's interaction with Rondon on November 6, 2016, was an adverse action.  The record shows that Plaintiff told Rondon she wanted to speak with Turano.  (Stanciu Decl., Ex. 14). In response, Rondon merely advised Plaintiff to go through the proper chain of command and then speak with Turano as a final step.  (*Id.*).  No reasonable jury could find such an innocuous exchange to be materially adverse, which is what is required under Title VII and the NYSHRL.

Turning to the issue of Plaintiff's desired transfer to Los Angeles, the Court believes it to be a close question whether Defendant's failure to fulfill Plaintiff's desires qualifies as an adverse action.  It is undisputed that Plaintiff repeatedly expressed her interest in transferring to Defendant's property in Los Angeles (*see* Augello Reply Decl., Ex. B at 6-7; Stanciu Decl., Ex. 14), and that Plaintiff's desired position was available as of November 4, 2016 (*see* Stanciu Decl., Ex. 12).  Plaintiff further testified that she verbally reaffirmed her interest in the transfer to Rodriguez (Pl. Dep. 117:8-18), and it is unclear

whether Rodriguez ever followed up with Plaintiff in response (*see* Rodriguez Dep. 101:23-102:7).  Based on the above, the Court believes that a reasonable jury could find that the failure to transfer Plaintiff was materially adverse enough as to dissuade a reasonable employee from bringing a complaint of discrimination.

Nevertheless, the Court finds that Plaintiff's Title VII and NYSHRL retaliation claim, insofar as it is based on Defendant's failure to transfer her to Los Angeles, fails.  Assuming that Plaintiff has made out a *prima facie* retaliation claim, the burden then shifts to Defendant to articulate a legitimate, non-retaliatory reason for the transfer.  *See N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d at 403.  If Defendant does establish such a legitimate, non-retaliatory reason, Plaintiff must then raise a triable issue by showing that the stated rationale was pretextual.  *See id.*  It is undisputed that Defendant has provided a legitimate, non-retaliatory reason — Ravines both told Plaintiff directly and swore in his affidavit that Defendant has a policy of not allowing transfers within the first six months of an employee's employment.  (*See* Stanciu Decl., Ex. 14; Ravines Aff. 14).  Moreover, Plaintiff has failed to raise a triable issue as to whether the cited policy was merely a pretext disguising Defendant's retaliatory motive.  Plaintiff argues that the policy is "arbitrary" and is not found in Defendant's Employee Handbook (Pl. Opp. 21), but this accomplishes no more than raising "some metaphysical doubt" as to the existence of the policy, *see Matsushita*, 475 U.S. at 586.  Plaintiff also cannot rely merely on the temporal proximity between her complaints and Defendant's failure to transfer

47

her.  *See El Sayed* v. *Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (explaining that temporal proximity alone "is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext").  Therefore, the Court grants Defendant's motion for summary judgment as to Plaintiff's Title VII and NYSHRL claims.

The analysis of Plaintiff's NYCHRL retaliation claims proceeds in much the same fashion, with the sole exception that the standard for what constitutes an adverse action is lower.  Specifically, under the NYCHRL, a plaintiff need only show that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Schaper* v. *Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2019) (quoting *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)).  However, even with this lower standard, the Court does not believe that a reasonable jury could find that any of the alleged adverse actions — apart from the failure to transfer — would be reasonably likely to deter a person from complaining of discrimination.  Moreover, Plaintiff's NYCHRL retaliation claim — insofar as it is based on Defendant's failure to transfer — fails because, as previously discussed, Plaintiff cannot point to any evidence that supports a theory that Defendant's six-month policy was pretextual.  Accordingly, summary judgment as to Plaintiff's retaliation claims under the NYCHRL is warranted.

In sum, Plaintiff has raised triable issues of fact as to both her hostile work environment claims and her constructive discharge claims, and therefore

both sets of claims will be preserved for a jury to decide.  However, there is insufficient evidence to support any of Plaintiff's retaliation claims, and accordingly summary judgment is granted as to those claims.[8]

## CONCLUSION

For the reasons set forth in this Opinion, Defendant's motion for summary judgment is GRANTED as to Plaintiff's retaliation and discrimination claims and is DENIED as to Plaintiff's hostile work environment and constructive discharge claims.  The Clerk of Court is directed to terminate the motion at docket entry 50.

The Court ORDERS the parties to appear for a telephonic conference on **May 28, 2020, at 3:00 p.m.** in order to discuss next steps in this case.  The dial-in information for the hearing is as follows: At 3:00 p.m., the parties shall call (888) 363-4749 and enter access code 5123533.  Please note, the conference will not be available prior to 3:00 p.m.

SO ORDERED.

Dated:  May 5, 2020
       New York, New York

_Katherine Polk Failla_

_____
KATHERINE POLK FAILLA
United States District Judge

---

[8]    In addition to the discussed claims, the Court reads Plaintiff's Complaint as asserting a standard discrimination claim under Title VII, the NYSHRL, and the NYCHRL. (*See* Compl. ¶¶ 47-48, 52-55, 59-61).  However, Plaintiff fails to assert this claim in her opposition, despite Defendant's recognition of the claim in its opening brief. (*See* Def. Br. 22-24).  Therefore, insofar as Plaintiff previously asserted discrimination claims, the Court considers those claims abandoned.  *See Jackson* v. *Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").